in Twombly and in the other circuit court opinions that we presented to you from the First Circuit, the Evergreen case, the Second Circuit, Andrew News, and the Fourth Circuit, SD3, they've all reversed district courts that have placed too high of a standard at the pleading stage on antitrust complaints, and that's what happened in this case. Thank you, Your Honors. Okay, thank both sides for your very skilled and helpful arguments. The case just argued is now submitted, and we've got one more case this morning. The next case is Rosenthal & Rosenthal v. Hilco Trading. I see two attorneys in front of me. If you can hear me, would you please raise your hands? I see two hands. We've read your briefs, and we look forward to your arguments. It's Mr. Haddad. I think you go first. Thank you. May it please the Court, Richard Haddad for the Plaintiff Appellant, Rosenthal & Rosenthal of CA. I would ask the Court to reserve three minutes for rebuttal. Okay. Rosenthal asks this Court to reverse the order of summary judgment and remand for jury claims for relief, and there is no legally conclusive defense available. Here, the evidence, which is primarily the defendant's own emails and the defendant's admissions, shows that in 2018, the Halston business was, quote, unsustainable, unquote. That's their word, unsustainable. None of the owners would invest any more money into this except for money from Rosenthal. Was Rosenthal already factoring at that time? Excuse me? Was Rosenthal already acting as a factor at that time? Yes. Rosenthal was already acting as a factor pursuant to a written factoring agreement. And were the defendants themselves financing at that time, or was all the financing coming from Rosenthal? At that time in 2018, all the financing was coming from Rosenthal. The defendants, Hilco was one of the owners of the company. Mr. Kalb was a manager of the company. And what they were looking to do in 2018, and it's right there in the emails, is to sustain the Halston business long enough for Hilco to realize on its plan to protect its own assets, which is to sell the name brand of Halston. And in order to sell the name brand of Halston, they needed to keep Halston goods on the store shelves in order to preserve the brand value, and in order to generate royalties from sales, which benefited Hilco's other company, Accel. And here, in order to get there from 2018, when this company became unsustainable, until the end, the only way to get there was for Halston to breach the warranties, the express written warranties in the factoring agreement with respect to the receivables. Because the way it works is we advance 85% on a receivable when it's sent to us, and each receivable carries with it a warranty. A warranty that the receivable is free from dispute. And critically, the definition of dispute, it's a defined term, capital D, in the contract. The definition of dispute on page 384 of the record says it's any dispute claim offset defense to the payment of a receivable for any reason or for no reason. Any reason at all, if there's a dispute, this receivable is not eligible for advancing 85%. And is the possibility, does the possibility of chargeback come under that definition? The possibility of chargeback does come under that definition, and here's... As I look at the record, it's well established that it was well understood that there were going to be some chargebacks, and the business all knew that. No. Well, here's the difference, Your Honor, and here's the critical legal factor. When one obtains a warranty, one bargains for the warranty. And Judge Learned Hand said it far more eloquently than I. We put that in the first paragraph of our reply brief. But when you get a warranty, it doesn't matter what you knew, what you thought, or anything else, because in addition to buying that receivable, you're buying that warranty. Just as if I were and was going to break in two weeks, doesn't matter. I go back to the manufacturer and say, I got a warranty. And when I get that warranty, they're required to honor it. And here, these folks knew, the defendants knew, actually knew, not suspected, not thought, but actually knew that there were going to be chargebacks, deductions in a tremendous amount, in an unsustainable amount. That's at page 397 of the record. They said there's going to be six and a half million dollars of chargebacks at the end of the current season. That's unsustainable. And Lord & Taylor is aggressively marking down the goods, anticipating margin guarantee payments. And they went on and said, we need to preserve this company to transition this business, re-establish royalty sharing opportunities, and save our value of our brand. And we look at that, and that's in the summer of 2018 at page 397. And right at that same point in time, these defendants recognized Rosenthal may not be paid in full. That's at page 101 to 102 of the record. And they write, we need to get an 11 and a half million dollar value to sell the name Halston, in order to get some benefit for ourselves, because we don't have a security interest in the name. We don't have a security interest in the royalties. Let me ask you, let me ask you this, if I may. This is not obviously a breach contract case. This is towards interference with contract. And the district judge holds that there's no reasonable jury can find that the defendants played any role in deciding which invoices would be assigned to Rosenthal. Do you disagree with that? I do disagree. And I disagree for several reasons. Yeah, so tell me why. Yeah, sure. Number one, they assigned all the receivables. There wasn't a pick and choose with respect to receivables. You say they, who's they? The company Halston assigned all the receivables and the defendants, Hilco and Mr. Kalb knew that. And we see that on page 229. Excuse me, knowing that is different from playing a role in making it happen. Do you have any evidence that they actually played a role in making it happen other than the fact that they just knew? Yes, it's several fold. Number one, under the California law and the cases that we've cited, the standard is relatively low. It's not that they must direct, it's not that they must cause, but it's enough to say under the Rosenfeld case, under the Angus case, it's enough that they encourage, persuade, influence, or pressure. It's a far lower standard than direct. And where is the evidence that they did any of those things? Because that was my understanding that for purposes of summary judgment, the district court determined there was no evidence that was presented that Hilco or Kalb directed Halston to assign to Rosenthal accounts that totaled more than what they knew would be collectible. So there was an absence, there were conclusories sort of, well, they had to have known, but there seems to, for tortious interference, they had to have done more than just know it was going on. So what was the evidence in the record that you presented to show that they actually were more involved in an orchestrating kind of way? Sure, and we presented substantial different pieces of evidence and including among them goes back to the end of 2018 where Hilco chastised the manager of Halston, telling him he's distasteful and you're not doing enough to save this brand. Hilco then sent their management team in to literally sit in the offices of Halston and tell them how to run the business. And then when I look at page 229 of the record, page 229 which is an internal email from Hilco, their internal email says, we are aware that there are substantial deductions with respect to these receivables, two to four million dollars. Rosenthal is not going to get repaid. There's a risk that there's going to be an additional four million dollars of chargebacks. And then they say the key point paragraph five of that email, page 229 of the record, Halston is continuing to ship, hopefully shipping close to three million in orders in the next two weeks, which will help the analysis. Well, what analysis could be helped? What else could be helped? We're not helped. Rosenthal's not helped. The only party that could be helped when faced with an unsustainable business is Hilco. Hilco was sustained because those dresses got on the shelves in those stores, Lord & Taylor's, Dillard's, Hudson Bay, and they preserved their market share in the fall and the winter 2018 into 2019 to preserve that business so they could sell it and make millions of dollars selling the brand and in revenue stream. And when I look at what they did and we see at page 229, we need to get certainty on the sale of the IP. That's the direction that this company was making with respect to Halston. That's the only way to get there. The only one way to get there without Hilco going into their advance so they could get the goods and put them in the stores on the shelves. And they had no regard whatsoever as to whether the Halston business was going to continue. They said, we are thinking of filing for bankruptcy. It's right there in the record 357, 101, 229. This company is dead. Our asset can be preserved if and only if we can get millions of dollars of receivables advanced against by Rosenthal. And then as we know, Rosenthal will not get repaid. We see that at 229 of the record. And that evidence was not properly applied by the lower court, your honor. It's a good question because that is exactly what the court found. And respectfully, the court was wrong, particularly on summary judgment. This evidence, those emails, the testimony of Mr. Calc, the other individuals should be presented to the jury and let them decide whether this conduct of chastising the manager, sending in your own management team to sit there and advise the company how to operate and directing that we get and say we must get millions of dollars to preserve this value. Is that enough to meet the standard of encourage, persuade, influence, or pressure as set forth in the Rosenfeld and Angus cases? And we submit, your honor, that it does. And that's sufficient to satisfy the elements of inducing breach of contract. Additionally, it supports the claim for unjust enrichment. The lower court held that there's no unjust enrichment because Hilco lost a lot of money. Well, we agree. Hilco lost a lot of money. When companies go out of money. But here, Hilco was able to mitigate its loss by keeping the Halston brand in the stores throughout the fall and winter 2018 into 2019, only by the use of our money, which got those goods into the stores and the stores never paid. Can I interrupt for just a minute? I think I agree with you on this point. That is to say that the mere fact that Hilco lost money doesn't mean that there's no restitution available because your argument is that they lost less money. Or rather, that they lost less money and the money saved should go back in restitution. I get that. But in order for restitution to be available, there has to be some wrongful act. And with respect to the tortious interference, if the or some loss reduced without the wrongful act, do you get restitution? No, but the district court is wrong. What I want to make the point is, if you lose on the tortious interference, do you necessarily lose on the restitution, even if they might have saved some money or reduced their loss? I think it would depend upon the basis on which you find that I were to lose on the interference. Let me pause it, although I, of course, don't expect you to agree. Let me pause it that you lose on tortious interference because there was no wrongdoing. Well, with the positive no wrongdoing, then I think the enrichment cannot be unjust. So I think that there has to be some element of that there in order to satisfy that claim. I think I agree with you on the point that it's not fatal to the restitution, the fact that they lost money. They might have lost less money. Yeah, I got it. Yeah. And so I would like to reserve my time. But I think what I when I look at it and see that they wrote that this business is unsustainable, there's aggressive markdowns coming. We know Rosenthal's not getting paid. And literally in the same breath, they say, let's keep shipping, hopefully shipping three million dollars in the next two weeks. And we sent those that money right out to them. And then the rug was pulled out. And when the music stopped, we didn't get paid. And Halston, the brand was sold to the benefit of Hilco. And we think it satisfies each element of the claim. And on de novo review, the summary judgment order should be reversed. And these facts presented to the trier and the jury. OK, thank you. Let's hear from the other side. And we'll make sure you get a chance to respond. Thank you. Your Honor, may it please the court. Lucas, thank you on behalf of the defendants and the police. So I think it's important to bring the court back to the actual applicable standard on a tortious interference claim. The trial court correctly ruled in this case that Rosenthal didn't present admissible evidence to create tribal issues when it granted summary judgment in favor of Hilco and Mr. Cal. So on the tortious interference claim specifically to survive summary judgment on this claim, the plaintiff was required to present evidence showing intentional acts to induce a breach. It means two things. First, there must be an identified act. It cannot be inaction, as was noted in the earlier argument. It cannot be knowledge. And it cannot be non-disclosure of information absent a duty to disclose. Now, the plaintiff pleaded a claim in the form of fraudulent concealment. The trial court dismissed it at the motion, excuse me, dismiss stage, and the claim was thereafter abandoned. So there's no remaining claim for concealment. Second, the act itself must be done for the purpose of inducing a breach or with substantial certainty that a breach would occur. That doesn't mean an intentional act that results in a breach. It doesn't mean knowledge of an underlying contract coupled with an act that results in a breach. Intent means the defendant actually knew at the time of committing the act that doing so was designed to accomplish the breach or that a breach would necessarily result. Okay, we just heard from the other side that Hilco sends in their own team. They look at the invoices and they say, send them out, even though we know that How do you respond to that? Your Honor, there's simply no evidence of that. As counsel himself noted, that was an internal email. There's no email directing from Hilco or Mr. Kaupp directing, as the trial court expressly found, directing HOC to send any specific invoices to Rosenthal to be factored. We have testimony from Mr. Malka stating that the company, that Hilco and Mr. Kaupp were not involved operationally to that level in HOC. And there's absolutely no evidence that they're reviewing the individual invoices at that time. And I think the other important point here is to look at the timeline here, the timing of Mr. Smiley's, the timing of the Mr. Smiley's review of the financials and the suggestion to spread chargebacks, that was back in was much later, months later, within weeks of when the company actually shut its doors. So to suggest that there is actual evidence of an ongoing plan to do this, again, it just simply has no evidentiary support. And I think that that's a second important point here, because stating facts that have no evidentiary support is really a running theme in Plano's presentation of this case. And I'd like to point the court very specifically to, and this is on page 10 of Plano's reply brief, which is a paragraph that's actually repeated from the opening brief. And the paragraph states, the defendants refuse to provide money to support their own company, unsighted. They refuse to guarantee additional losses, unsighted. They sent a member of their senior management, Mark Smiley, to sit in Halston's offices. Some citations to deposition testimony, that's undisputed. And most critically, they insisted that Halston continue to keep goods on the store shelves, regardless of whether the stores would even pay the invoices to protect Cocoa's personal economic interest in the brand name Halston and continuing revenue stream for Excel. The citations provided simply do not support those points. None of those citations show that Hilco or Mr. Calp insisted on anything. None of those citations show that Mr. Calp or Hilco ordered goods to be on store shelves. There's absolutely no evidence that in these communications, Mr. Calp and Hilco were considering revenue income to Excel. This is pure speculation, your honor, with absolutely no page. So the plaintiff has argued that there is at least circumstantial evidence and that Hilco pressured or encouraged Halston to operate in a way that would result in breaching its obligations to Rosenthal, knowing that Rosenthal would bear the losses here and their motivation for doing that was their own interest in trying to keep the Halston label relevant so that they could sell the IP. And your position is that that summary of circumstantial evidence doesn't support that conclusion, that it is it's a house of cards? That's exactly right, your honor. It is purely speculative and I think the Angus case, the plaintiff relies on, is actually a good example. In that case, the defendant threatened to sue the company if it didn't engage in the actions that led to the breach. Where's the evidence in this case that Mr. Calp or Hilco threatened HOC with any action on penalty of or in with the intent, with the purpose of breaching the factoring agreement? Again, it's supposition and speculation. It's unsupported by the evidence and that's why this case was dismissed on summary judgment because that's exactly what the trial court found. But if the argument isn't that they did it with the intent to have Halston breach its agreements, its obligations to Rosenthal, but they took or directed or again pressured activity that had a substantial certainty of that contract between Halston and Rosenthal ending up being breached, that that's enough for tortious interference or at least to have raised a material fact and dispute that a jury should have to wade through. If there were evidence of a substantial certainty that in this context, yes, that HOC would be breaching the agreement, a sense was it would survive. There is no such evidence of any actions directed with that intent or actions towards HOC directed with that intent or that purpose. If I may provide another example of I think the type of overreaching that the plaintiff has relied on in this case to try to support a claim. And that is this concept that defendants' knowledge of chargebacks, and this is something else that was addressed in prior argument, that defendants' knowledge of chargebacks somehow led them to understand that as your Honor noted, chargebacks are industry standard, they are expected, they're taken for all sorts of reasons, and most are negotiated before they're actually applied. But most importantly for this case, at the time that a manufacturer presents an invoice to a factor to be factored, it does not know what chargebacks are going to be taken on that invoice. To argue that it is a breach of the factoring agreement to present any invoice that at some point may be subject to a chargeback means that every invoice presented in this industry under the factoring agreement would breach it. That is essentially the plaintiff's position here. And not only that, the position is not only would it breach the agreement, but that knowledge was so obvious that third parties, the defendants, would have known it when communicating with HOC. Again, there's simply no evidence, number one, that it would breach the factoring agreement, and certainly no evidence that my clients would have known about it to a degree that would make them possibly liable on a claim for intentional interference. And let me provide just one more example that I think the trial court really focused on as well, which is this concept that the defendants directed specific invoices to be assigned. I believe I've covered that, and there is no such evidence. Your Honors, after substantial discovery, including thousands of pages of emails exchanged, there are only three pieces of evidence in this case that pointed that the plaintiff has cited to repeatedly in this case to support its claim, none of which really do. I'm happy to walk the court through these, but in the interest of time, I'm also happy to entertain further questions and just rest on the papers, which I think have any further questions from the bench. Seeing none, do you rest at this point? I do. Mr. Haddad, you saved a little time. Let's put two minutes on the clock and see what happens. Thank you, Your Honor. Council said there was no evidence of HILCO's knowledge of the chargebacks, but there is, and it's in HILCO's emails. In fact, their exact words on page 229 of the record, the exact words are, quote, we are aware that there is a $2 to $4 million deduct from Hudson's Bay and Lord and Taylor, unquote, paragraph number two on page 229 of the record. We are aware of the deduct, and it might be as much as $4 million. Although I have to say that not only do we have this question of awareness, we've been arguing on either side that chargebacks are perfectly consistent with the agreement. I gather you and your adversary are in disagreement simply as to how to read the factoring agreement. Is that right? Well, I think that they've done a good job of trying to persuade the lower court that that's the case, but when we actually read the which is on page 384 of the record, it's a defined term, and it's, quote, any dispute, claim, offset, defense, counterclaim, or any other reason, including merchandise returns, or no reason for nonpayment or any refusal to pay all or any portion of a receivable. That's the definition, and here there were known reasons. Those known reasons were this business was unsustainable. That's Hilco's word, quote, unquote, unsustainable, 357 of the record, and what happened there? It was unsustainable, which means necessarily, actually, and per their own writings that the stores were not going to pay. It wasn't a mere chargeback. It's we're not going to pay. $6.5 million is reflected in page 357 of the record. Another $2 to $4 million on page 397 of the record, and what happened in the weeks immediately after that? They submitted invoices to us, millions of dollars. We put the schedule attached to the complaint, millions of dollars, September and October of 2018, millions of dollars. We advanced 85 percent against that, and we got zero because they shut down the shop, closed the company, the corporate business, sold the name, realized millions of dollars in preserving the brand precisely because those goods were on the shelves, and left us holding the bag, and under those circumstances, Your Honor, I think the appropriate outcome here is a reversal because I think we have the facts. We have the actual documentary evidence, and these facts should be presented to the jury to reach that conclusion as to whether they encouraged, persuaded, influenced, or pressured because we see the evidence that the management was chastised. I mean, we see the actual written evidence of chastising the management. That's at page 98, and thereafter, the other factors that we pointed to in our papers, so we would ask that the summary judgment order be reversed and the for your useful arguments. Rosenthal and Rosenthal of California versus Hillcote Trading now submitted for decision, and that concludes our argument session for this morning. Thank you very much.
judges: FLETCHER, RAWLINSON, Bencivengo